UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| WESTCOR LAND TITLE ) | |
| INSURANCE COMPANY, ) | |
| ) | |
| Plaintiff ) | |
| ) | |
| v. ) | No. 2:23-cv-00026-NT |
| ) | |
| VIRGINIA McCARTHY, ) | |
| ) | |
| Defendant ) | |

**ORDER ON MOTION FOR ATTACHMENT
AND ATTACHMENT ON TRUSTEE PROCESS**

In this breach of contract action, Westcor Land Title Insurance Company seeks to recoup the money it spent clearing a cloud on the title of a home sold by Virginia McCarthy. Westcor now moves for an attachment and attachment on trustee process against the property of Virginia in the sum of $143,924.13. *See* Motion (ECF No. 3). Because I conclude that that Westcor is more likely than not to recover judgment against Virginia in an amount equal to or greater than that sum, I grant its motion.

## I. Legal Standard

When presented with a motion for attachment and attachment on trustee process, this Court applies Maine law pursuant to Federal Rule of Civil Procedure 64 and this Court's Local Rule 64. *Naes Corp. v. Coastal Res. of Me., LLC*, No. 1:20-cv-00201-NT, 2020 WL 7233350, at *2 (D. Me. Dec. 8, 2020). To obtain an attachment or an attachment on trustee process, a plaintiff must show that

1

> it is more likely than not that the plaintiff will recover judgment, including interest and costs, in an amount equal to or greater than the aggregate sum of [the attachment or trustee process] and any liability insurance, bond, or other security, and any property or credits attached by other writ of attachment or . . . trustee process shown by the defendant to be available to satisfy the judgment.

Me. R. Civ. P. 4A(c); Me. R. Civ. P. 4B(c).  A plaintiff's motion must also be accompanied by an affidavit or affidavits setting forth "specific facts sufficient to warrant the required findings."  Me. R. Civ. P. 4A(i), 4B(c).  In this case, Westcor also filed an affidavit with its reply brief.  As this Court has noted,

> while Rules 4A and 4B do not expressly permit a plaintiff to file a reply or supplemental affidavit in support of a motion for attachment and trustee process and Maine's case law touching upon any such practice is inconclusive, it would not serve the interests of the just, speedy, and inexpensive determination of this action to analyze the sufficiency of [a plaintiff's] motion for attachment and trustee process in the absence of this affidavit, only to have to possibly reconsider it at a later date with the affidavit.

*Naes*, 2020 WL 723350, at *3 (cleaned up).

## II. Background

In 2002, Virginia took title to property located at 83 Whitten Hill Road in Kennebunkport, Maine (the "Property").  Affidavit of Virginia McCarthy ("McCarthy Aff.") (ECF No. 9-6) ¶ 2.  Although Virginia was married to Ralph Eugene McCarthy, the Property was never titled in Ralph's name.  *Id*. ¶¶ 3-4.

On August 21, 2006, Ralph entered into a loan agreement with Countrywide Bank, N.A., with a credit line of $147,200 (the "Note").  Affidavit of Benjamin Sharpe ("Sharpe Aff.") (ECF No. 3-1) ¶ 4.  To secure the Note, Virginia executed a mortgage in favor of Mortgage Electronic Registration Systems, Inc., as nominee for

2

Countrywide (the "Mortgage") although she was not a party to the Note. *Id.* ¶ 5. In 2012, the Mortgage was assigned to Bank of America, N.A. (BOA). *Id.* ¶ 6.

The line of credit secured by the Mortgage was used in connection with Ralph's business. McCarthy Aff. ¶ 8. Virginia generally did not handle the household finances and was never involved in paying the Note. *Id.* ¶ 9. Ralph passed away on June 5, 2016. *Id.* ¶ 10. Later that month, Virginia went to the BOA branch office in Saco, Maine, to inquire about the Note and make any necessary payment. *Id.* ¶ 11. She was told that the account had been paid in full and no longer existed. *Id.* ¶ 12. Ralph's estate was probated in the York County Probate Court. Affidavit of Matthew J. Williams ("Williams Aff.") (ECF No. 9-1) ¶ 7. BOA never filed a claim against Ralph's estate in accordance with 18 M.R.S. § 3-803. *Id.*

Virginia never received a bill from BOA after her visit to the Saco branch in June 2016 and thought nothing further about the matter until her real estate broker told her, as she was in the process of selling the Property to Jamila and Suzanne Marie Bayati (the "Buyers") in the fall of 2021, that the Mortgage was still encumbering the Property. McCarthy Aff. ¶ 13. Virginia informed her broker that she had been told by the bank that the Mortgage had been paid off and that the bank had made no attempt to collect anything from her or Ralph's estate. *Id.* ¶ 14.

On December 3, 2021, shortly before the closing on the sale of the Property, Virginia signed an addendum to her purchase and sale contract with the Buyers in which she (1) agreed that, even after the close of the transaction, she would "exercise diligence and assist the Mortgage Discharge Tracking Service hired by QuickSilva

Title[1] to resolve any cloud on title, including, but not limited to" the BOA loan, (2) "represent[ed] and assure[d]" that the BOA loan "was paid off to zero balance at the time of refinance in 2016," and (3) agreed that if it were determined that the Property had "a cloud on title relating to any outstanding debt" she owed, she would "work with the lender or servicing company to resolve any cloud on title within 90 days of the close of the sales transaction." Affidavit of Benjamin Sharpe ("Second Sharpe Aff.") (ECF No. 12-1) ¶ 4; ECF No. 2. In signing that document, Virginia and the Buyers acknowledged the real estate agency's "advice to seek legal, tax and other professional advice as necessary in connection with sale/purchase of property." ECF No. 2.

At or shortly before the December 10, 2021, closing, Virginia was told that $2,500 would be withheld from her proceeds to be used by the settlement agent, QuickSilva Title, to obtain any paperwork needed to clear title to the Property. McCarthy Aff. ¶ 16. At the closing, both Virginia and the Buyers signed an Escrow Holdback Agreement detailing that arrangement. *Id.* ¶ 17; ECF No. 9-7. Virginia sold the Property to the Buyers by warranty deed, which included a covenant that the Property was free of encumbrances. Sharpe Aff. ¶ 8: ECF No. 3-2. The Buyers purchased title insurance from Westcor for the Property, Sharpe Aff. ¶ 9, and Virginia signed three documents in favor of Westcor, all dated December 10, 2021: an Indemnity Agreement and two affidavits, *id.* ¶ 11; ECF No. 3-3; Second Sharpe Aff. ¶¶ 5-6; ECF Nos. 12-3, 12-4.

---

[1] While this document refers to "QuickSilva Title," its full name is QuickSilva Title and Escrow, LLC. *See* McCarthy Aff. ¶ 16; ECF No. 9-7 ¶ 1.

4

In the Idemnity Agreement, Virginia agreed to "indemnify and save [Westcor] harmless against any and all" expenses incurred in connection with the undischarged Mortgage.  ECF No. 3-3 ¶ (a).  The Indemnity Agreement noted that, as security, Virginia had deposited $2,500 with QuickSilva Title to be used to reimburse Westcor for any expenses, and directed that Virginia "immediately undertake the actions necessary to obtain and record a release" of the Mortgage, failing which Westcor could, "in its sole discretion, . . . commence or continue any action necessary to obtain and record a release" of the undischarged Mortgage.  *Id*. ¶¶ (b)-(c).

Virginia also signed a Westcor Residential Mechanic's Lien and Parties in Possession Affidavit under penalty of perjury "for the purpose of inducing [Westcor] to insure the mortgage on said property," and an Owner Affidavit, sworn before a notary public to be her free act and deed, in which she represented that there had been no "draws against any open equity line loans secured by" the Property "that are to be paid down or closed as a condition of the loan."  Second Sharpe Aff. ¶ 4; ECF Nos. 12-3, 12-4.

As of December 10, 2021, the Mortgage had not been paid off and discharged.  Sharpe Aff. ¶ 10.  In a letter to the Estate of Ralph McCarthy dated March 25, 2022, BOA stated that, in "response to your inquiry, the balance of $143,924.14 is due on the above account."  Second Sharpe Aff. ¶ 3; ECF No. 12-2.  BOA added that, because of the account's "delinquency status," the balance was "due in full."  ECF No. 12-2.

In April 2022, the Buyers made a claim on their title policy with Westcor to address the cloud on their title created by the undischarged Mortgage.  Sharpe Aff.

5

¶ 13. Westcor sent Virginia a letter dated June 2, 2022, in which it demanded that she pay off the Mortgage. McCarthy Aff. ¶ 20. With that correspondence, Westcor enclosed a copy of an Indemnity Agreement with Virginia's signature on the last page that was not signed by Westcor. *Id.* ¶ 21; ECF No. 9-8.

Virginia did not take the necessary steps to obtain a satisfaction of the mortgage. Sharpe Aff. ¶ 14. Westcor paid BOA $143,924.13 by check dated September 15, 2022, and BOA issued and recorded a release of the Mortgage. *Id.* ¶ 15; ECF Nos. 3-4, 3-5. Westcor has demanded that Virginia pay the amounts expended to clear title and related expenses and fees, but Virginia has refused to pay. Sharpe Aff. ¶ 16.

In a series of emails in August and September 2022, Matthew J. Williams, an attorney admitted to practice law in the State of Maine who represents Virginia in this matter, informed Westcor that BOA did not have an enforceable debt secured by the Mortgage due to the bank's failure to file a notice of claim against Ralph's estate as required by 18-C M.R.S. § 3-803. Williams Aff. ¶¶ 1, 8; ECF No. 9-5.

Virginia was not represented by counsel when she sold the Property. McCarthy Aff. ¶ 15. She does not recall signing the Indemnity Agreement or ever being told about Westcor or its role at the closing. *Id.* ¶ 18. She would not have moved forward with the closing on her Property had she known that she could be held responsible for obtaining a discharge of the Mortgage or for paying any debt that Ralph may have owed on the Note. *Id.* ¶ 19.

### III. Discussion

Westcor sues Virginia for breach of the Indemnity Agreement. *See* Complaint (ECF No. 1) ¶¶ 20-24; Motion at 4. "To prevail on a breach of contract claim under Maine law, there must be a legally enforceable contract consisting of (1) a meeting of the minds; (2) consideration; and (3) mutuality of obligations." *Von Hirsch v. Olson*, No. 2:21-CV-00107-NT, 2022 WL 123895, at *6 (D. Me. Jan. 13, 2022) (cleaned up). "Proof of a breach of contract action consists of three elements: (1) breach of a material contract term; (2) causation; and (3) damages." *Id*. (cleaned up).

Westcor argues that Virginia plainly breached the Indemnity Agreement, including her promise to indemnify and save Westcor harmless "against any and all liability, costs, losses, damages, attorneys' fees and expenses of whatever kind or nature which the Company may incur or sustain as a result of issuing the above-described title insurance policies." Motion at 4 (cleaned up). Unsurprisingly, Virginia disagrees. *See* Opposition (ECF No. 9) at 4-8.

Virginia first contends that the Indemnity Agreement is unenforceable for lack of consideration because she made no bargain with Westcor. *See* Opposition at 4-6; *Panasonic Commc'ns & Sys. Co. v. Maine,* 1997 ME 43, ¶ 12, 691 A.2d 190 ("Before a party's performance may constitute consideration, there must be a bargained-for promise in exchange for which consideration is given."). She asserts that she sought no promise or performance from Westcor, and Westcor provided no benefit or promise to her. *See* Opposition at 4. Indeed, she notes, she had no idea what Westcor was or the point of its role in the closing transaction. *See id*. She argues that "[t]he

7

bargaining in this instance appears to have been between Guaranteed Rate, Inc. [the Buyers' lender] and Westcor," pointing out that she "had already bargained with the [Buyers] to deal with the issue of the undischarged mortgage—that was the purpose of the Escrow Holdback Agreement." *Id*. at 5-6.

Yet, the Indemnity Agreement was part and parcel of the entire transaction. In the pre-closing addendum to Virginia's home-sale contract with the Buyers, she (1) represented that there was no balance due on the line of credit, (2) promised to assist QuickSilva Title, in its capacity as settlement agent for the Lender, to expeditiously "resolve any cloud on title," and (3) agreed that if it were determined that the Property had "a cloud on title relating to any outstanding debt" she owed, she would "work with the lender or servicing company to resolve any cloud on title within 90 days of the close of the sales transaction." ECF No. 13.

In turn, the Indemnity Agreement stated that because the Lender had agreed to make the loan to the Buyers if Westcor agreed to provide title insurance covering the undischarged mortgage, and Westcor had agreed to issue that insurance provided Virginia indemnified it for any losses related to the undischarged mortgage, Westcor had agreed to provide title insurance. *See* ECF No. 3-3 at 1-2. The Indemnity Agreement cross-referenced the Escrow Holdback Agreement, stating that as "security for" Virginia's agreement "to indemnify and save [Westcor] harmless," she had deposited $2,500 to be held by QuickSilva Title. *Id*. at 2.

In essence, Virginia promised to lift the cloud on title post-closing in exchange for being able to close on the sale of her home. The Indemnity Agreement, therefore, was supported by consideration.

Virginia next argues that the Indemnity Agreement is unenforceable because neither she nor apparently Westcor believed that BOA was owed or would seek payment on any past-due debt. *See* Opposition at 7. She says that she never would have moved forward with the closing had she known she could be held responsible for a debt Ralph may have owed on the note. *See id*.

As Westcor points out, *see* Reply (ECF No. 12) at 5, mutual mistake is an affirmative defense, which a court need not consider in weighing whether to grant an attachment, *see Porrazzo v. Karofsky*, 1998 ME 182, ¶ 7, 714 A.2d 826. However, "[i]f the applicability of an affirmative defense is clear, then a court can consider the application of the defense in its determination whether the requirements of Rules 4A(c) and 4B(c) have been met." *Id*. Because, in this case, the applicability of the defense of mutual mistake turns on construction of key agreements, I will address it.

A mistake of fact invalidates a contract "if the parties entertain a conception of the facts which differs from the facts as they really exist." *Interstate Indus. Unif. Rental Serv., Inc. v. Couri Pontiac, Inc.*, 355 A.2d 913, 918 (Me. 1976). "The mistake must be mutual, that is, the minds of the parties must fall prey to the same misconception with respect to the bargain." *Id*. This showing must be made by clear and convincing evidence. *See Moulton v. Moulton*, 1998 ME 31, ¶ 9, 707 A.2d 74.

Virginia argues that because only the "meager" amount of $2,500 was placed in escrow, "it does not take a tremendous leap of logic to determine that Westcor, like [her], viewed the undischarged mortgage more as a 'paperwork issue' as opposed to an actual debt that the bank would claim was owed." Opposition at 7. This, however, is not clear and convincing evidence that Westcor shared Virginia's belief that no debt was due and owing. Instead, as discussed above, the key agreements indicate that Westcor would not have provided the title insurance needed to close the Property sale transaction without Virginia's agreement to hold it harmless from *any* expenses arising from the cloud on title.

Finally, Virginia contests Westcor's demand for indemnification on the basis that Westcor repaid a debt that was rendered null and void because BOA never timely filed a claim against Ralph's estate. *See* Opposition at 8. She notes that pursuant to 18-C M.R.S. § 3-803(1), claims against a decedent's estate are barred, at the latest, nine months after death. *See id.*

Nevertheless, as Westcor points out, *see* Reply at 1-2, this Court recently rejected a nearly identical argument, holding that a mortgage securing a promissory note signed by a decedent remained enforceable even though the mortgagee had failed to file a timely claim in probate court, *see Johnson-Toothaker v. Bayview Loan Servicing LLC*, No. 2:20-cv000371-JDL, 2022 WL 3278883, at *4 (D. Me. Aug. 11, 2022). This Court noted that pursuant to *Johnson v. McNeil*, 2002 ME 99, ¶ 13, 800 A.2d 702, a "mortgage may still be enforced through available foreclosure remedies, such as an in rem foreclosure action, even if the note is unenforceable,

10

because Maine is a title theory state." *Johnson-Toothaker*, 2022 WL 3278883, at \*5. Accordingly, in *Johnson-Toothaker*, "the Cumberland County Probate Court's determination that the mortgaged property at issue never passed through [the decedent's] estate, and that the note creditor could not reopen the estate due to the running of the statute of limitations," rendered only the promissory note—not the mortgage—unenforceable. *Id*. at \*6.

At bottom, Virginia has not demonstrated that the Indemnity Agreement is likely to be found unenforceable or that Westcor need not have paid off the BOA debt. Conversely, by pointing to the plain terms of the Indemnity Agreement and submitting evidence that Virginia has not fulfilled her obligations under those terms, Westcor has demonstrated that it will more likely than not recover judgment for breach of contract in an amount equal to or greater than the $143,924.13 it seeks to attach.[2] Accordingly, Westcor is entitled to an attachment and an attachment on trustee process in that amount.

## IV. Conclusion

For the foregoing reasons, I **GRANT** Westcor's motion and **ORDER** that Westcor shall have an attachment and attachment on trustee process against the property of Virginia McCarthy in the amount of $143,924.13.

---

[2] Because I conclude that Westcor is more likely than not to recover judgment on its breach of contract claim, I need not analyze its alternative unjust enrichment claim against Virginia. *See* Complaint ¶¶ 25-28; Motion at 4-5; *Knope v. Green Tree Servicing, LLC*, 2017 ME 95, ¶ 13, 161 A.3d 696 ("The existence of a contractual relationship between the parties that addresses the sums in dispute precludes recovery on a theory of unjust enrichment." (cleaned up)).

### *NOTICE*

*In accordance with Federal Rule of Civil Procedure 72(a), a party may serve and file an objection to this order within fourteen (14) days after being served with a copy thereof.*

*Failure to file a timely objection shall constitute a waiver of the right to review by the District Court and to any further appeal of this order.*

Dated: June 16, 2023

/s/ Karen Frink Wolf
United States Magistrate Judge
